[Cite as *State v. Cowgill*, 2026-Ohio-957.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
FULTON COUNTY

State of Ohio                                        Court of Appeals No.  F-25-001

    Appellee                                     Trial Court No.  24 CR 0162

v.

Michael Cowgill                                **DECISION AND JUDGMENT**

    Appellant                                    Decided: March 20, 2026

* * * * *

T. Luke Jones, Fulton County Prosecuting Attorney,
and Paul H. Kennedy, Assistant Prosecuting Attorney,
for appellee.

Karin L. Coble, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Michael Cowgill, appeals the April 17, 2025 judgment of the

Fulton County Court of Common Pleas, convicting him of one count of rape, in violation

of R.C. 2907.02(A)(2), a felony in the first degree, and sentencing him to 10 to 15 years'

incarceration, five-years post-release control, and lifetime registration as a Tier III Sex

Offender.  For the following reasons, we affirm.

## I. Factual Background

{¶ 2} On November 19, 2024, Cowgill was indicted for four counts of rape arising out of allegations of sexual abuse made by his daughter, E.M. Each count represented a different date range of alleged abuse—count one took place from January 1, 2024 through January 2, 2024; counts two and three took place from January 3, 2024 through July 2, 2024; and count four took place from July 3, 2024 through July 4, 2024.

{¶ 3} The case was tried before a jury beginning March 6, 2025. The State presented the testimony of six witnesses—the victim, E.M.; her mother, E.W.; the deputy who performed the search of Cowgill's house; the sexual assault nurse examiner ("SANE") who treated E.M.; an Ohio Bureau of Investigation ("BCI") technician; and the detective who interviewed Cowgill. Cowgill presented one witness—his son, G.C., and testified on his own behalf. After a three-day jury trial, Cowgill was found not guilty of counts one through three and guilty of count four. The following facts were developed at trial.

### A. Background

{¶ 4} The victim in this case is Cowgill's daughter, E.M. Prior to E.M.'s allegations that her father had raped her, Cowgill had been the primary custodian of E.M and her half-brother, G.C.

{¶ 5} At the time of the alleged incident, E.M. was 17 years old, but it was revealed at trial that she has serious mental health diagnoses. According to Cowgill, she performs at a second-grade level, and has a history of lying and violence. A

2.

psychological evaluation of E.M., which was presented as Defendant's Exhibit F, explains that E.M. had been diagnosed by the Zepf Center with "disruptive mood dysregulation disorder, attention deficit hyperactivity disorder (ADHD), and reactive attachment disorder (RAD)," and by Akron's Children's Hospital with "nonpsychotic mental disorder, suicidal 'ideological', opposition defiance disorder and autism." E.M. had also been engaging in outpatient therapy for several years.

{¶ 6} In the months leading up to the incident at issue in this case, E.M. had been struggling with suicidal ideations and attempts. Because of this, Cowgill had implemented safety measures throughout his home including keeping E.M. from the second story and locking his bedroom. During this time, E.M. also had stays in different hospitals and in Juvenile Detention Center ("JDC").

{¶ 7} E.M.'s behavioral changes and treatment during the times of alleged abuse was a large topic at trial, however, because Cowgill was acquitted of counts one through three, our review will primarily focus on the evidence specifically relating to count four and the events of July 3 through July 5, 2024.

## B. E.M.'s Testimony

{¶ 8} The State's first witness was E.M. According to E.M., on July 3, 2024, Cowgill took her half-brother, G.C., to his mother's house for visitation. Once he was dropped off, she and Cowgill went to Walmart where Cowgill purchased her food and an outfit—a pair of jeans and a crop top. E.M. testified that Cowgill told her that she had to "do something for him," in exchange for the clothes. She stated that she did not know

3.

what "doing something for him" meant "because I always tried to shut it out about what it means." She then stated that they left Walmart and when they got home, she ate and then fell asleep in the living room. When asked what happened next, E.M. said that Cowgill woke her up and told her what she had to do. E.M. told the court that "he had intercourse with me and it was not fun" and then reiterated that "[h]e made me do intercourse."

{¶ 9} When asked what she meant by "intercourse," E.M. said that Cowgill was naked and that to her, "to have intercourse" meant "sexual abuse." When asked, "what parts of your body and his body were involved," E.M. answered "I'm too uncomfortable. I'm too uncomfortable" and was guided to discuss where the abuse happened. When asked where it occurred, she said the living room, on the couch. E.M. described Cowgill pushing her over the edge/arm of the couch and "started doing the intercourse stuff" and removed her clothing E.M. explained that:

> A. He started doing the intercourse stuff and I lost so much that I, I just closed my eyes and tried not to think of it, what was going on.
>
> Q. Ok. How did it feel physically to you when that was happening?
>
> A. Painful.
>
> Q. What did you - painful? Ok. Painful where on your body?
>
> A. My down below part.
>
> Q . Your down below part?
>
> A. Mm-hmm.
>
> Q. Ok. Did your dad say anything to you while this was happening?
>
> A. No.
>
> Q. Ok. Did you hear or make any noises or do anything else while it was happening?

4.

A. No.

Q. Any idea how long it, it lasted?

A. No.

* * *

Q. And while this was happening did you ever see his down below part?

A. No.

Q. No, ok. Why, why was that?

A. It just, I just [unintelligible] but I felt it.

{¶ 10} E.M. explained that after it was over, she went and locked herself into her room and hid away for the rest of the night.

{¶ 11} E.M. also described the events of July 4, 2024—the day after the incident. She testified that she had been at her mom's house when she "got really stressed out and then started getting suicidal" and tried to run into traffic and tried to cut herself. When asked why she was stressed that day, E.M. answered "[b]ecause Dad assaulted me and it just keeps running in my mind, always having flashbacks." E.M. then explained how she told her mother that "Dad is doing things he's not supposed to with me," and that her mother responded by calling the police and taking her to the hospital.

{¶ 12} In addition to describing the events of July 3 and 4, 2024, E.M. also testified more generally about ongoing sexual abuse. She mentioned that she was afraid of getting pregnant and explained that for two months, she tracked what her dad did to her on her tablet, so she did not forget how late her period was. When asked why she was afraid of getting pregnant, E.M. told the prosecution, "[b]ecause of what Dad was doing to me."

5.

{¶ 13} When asked about the "protection stuff" (condoms), E.M. explained that they were something men put on their bodies. She stated that Cowgill's protection things were in a drawer and that she knew they were in the drawer because she always saw him put stuff in there. However, she then testified that she could not recall if she had ever seen Cowgill put "a protection thing" in the drawer and while she had not seen Cowgill use one, she thought he was using them with her "because I knew he wouldn't want to get caught and he didn't want me to get pregnant." When asked what Cowgill would be doing before he put the protection things in the drawer and whether he would be doing something by himself or with E.M. or her brother, E.M. answered "[w]ith me."

{¶ 14} E.M. told the court that she had been trying to show her brother the condoms in Cowgill's room to try and get him to call and tell his mother. E.M. explained that she believed that G.C.'s mother could help her get out of Cowgill's house, however, when she tried to tell her brother about the abuse, he did not want to see it and did not believe her. When asked why she wanted to get out, E.M. told the court that she did not feel safe and was afraid that Cowgill was going to hurt her.

{¶ 15} E.M. additionally testified that she never went looking in the house for the condoms, never touched them, and never looked through the drawers to see what was in them. However, on cross-examination, E.M. did note that the door to her father's room was not always locked like it was supposed to be.

6.

{¶ 16} When asked about telling anybody about what her dad did to her, E.M. testified that Cowgill told her never to tell and that no one was going to believe her. She explained that she believed Cowgill when he said that, because she lies a lot.

{¶ 17} E.M. also identified pictures that she had drawn with her "Child Service worker" where she had drawn circles around "Dad's down below area" and her own "down below area" to show where the abuse happened. When asked what the word for those areas were, E.M. did not know what either was called.

{¶ 18} Finally, E.M. discussed her relationship with her dad. On cross-examination, she acknowledged that she told people that Cowgill never did anything to her, but explained that it was because "I didn't want him to be in trouble. Because I know my brother misses him." When asked about whether she wanted to see her dad, she stated that she did at first to make sure he was okay, but now she does not. She additionally testified that she told her case workers that she wanted to go home to Cowgill, but was told she was not allowed to.

## C. E.W.'s testimony

{¶ 19} Next, E.M.'s mother, E.W., testified. She explained that she lost custody of all her children due to "cleanliness" issues in her home and that Cowgill gained custody of E.M. during that period. E.W. explained that she had no contact with E.M. for several years prior to reconnecting when E.M. was around 15 or 16. However, E.W. then explained that she really did not have experience with E.M. until January or February of 2024 when they increased visitations and E.M. started coming over for overnights.

7.

**{¶ 20}** Relevant to the appeal, E.W. testified that after reconnecting, she started to notice E.M.'s behavior deteriorate. "[E.M.] would constantly talk about suicide and that nobody could put rules on her, um, she was just bouncing everywhere, it was just energy that was negative and it was hard." She further explained that at this point, E.M. was getting in trouble frequently and was in and out of court and hospitals.

**{¶ 21}** Regarding the night of July 4, 2024, E.W. testified that E.M. refused to take her medications and locked herself in the bathroom. E.M. then ran out of the apartment and screamed at E.W. that Cowgill was "raping" her and that nobody would believe her. E.W. said that she told E.M. that she believed her and then called police and took E.M. to a hospital where she stayed with E.M. while the rape kit was performed.

**{¶ 22}** When asked how E.M. was acting the morning following the exam, E.W. answered that she was "[s]tressed. Scared. She told me what I had heard her say to me over and over again, I shouldn't have done it, I just want to go home to him, he's going to be so angry, sad, she said I feel so bad for doing this." When asked if E.M. had done or said anything to make E.W. believe that she had made the story up, or retracted her story, E.W. stated that she had not.

### D. Deputy Hensley's testimony

**{¶ 23}** Deputy Chase Hensley, the officer who searched Cowgill's home, testified that he received a call to investigate allegations of a sex offense involving Cowgill. He explained that he had been on patrol and after the call, went to Cowgill's house in the early hours of July 5, 2024. Deputy Hensley testified that when he arrived at the house,

8.

he found Cowgill sitting on the front porch waiting for him, aware that a report had been made.

{¶ 24} According to Deputy Hensley, he told Cowgill that they were in the process of getting a search warrant and would be treating the investigation as if the allegations were true. Cowgill told Deputy Hensley that he understood and gave him consent to search the home. Deputy Hensley testified that he knew where to look when he went into the residence because E.M. told her victim advocate that there were condoms saved in the bedside drawer, so when he went into the residence, he began to search the bedroom. During his search, Deputy Hensley found a homemade sex toy, three condoms, and a condom wrapper. He photographed the entire area then bagged the condoms and wrappers for evidence.

{¶ 25} After finishing his search, Deputy Hensley came back out to discuss what he found with Cowgill. According to Deputy Hensley, he first asked Cowgill if he would have found anything that would have piqued his interest and that Cowgill told him there were possibly knives in his room that he would have kept from E.W. Deputy Hensley then explained to Cowgill that he found condoms under the drawer. In response, Cowgill told the deputy that he used the condoms with the homemade sex toy as a means to keep the toy clean.

{¶ 26} Deputy Hensley next told the court that he discussed getting a DNA sample with Cowgill and that Cowgill consented to giving the sample. He testified that his partner, Sgt. Rodriguez, was the one who took the sample while he witnessed.

9.

{¶ 27} All of Deputy Hensley's testimony was corroborated by photos and body worn camera footage shown to the jury and admitted into evidence.

**E. SANE testimony**

{¶ 28} Sharla Young, a registered nurse and SANE (sexual assault nurse examiner), testified next and explained that that she was the one who examined E.M. when her mother took her to the hospital after E.M. made the allegations against Cowgill. Young described meeting with E.M., E.W., E.W.'s significant other., and the victim advocate. She characterized E.M. as "childlike" in her mannerisms—the way she held her blanket and pillow, her speech, and the way that she wrote her name.

{¶ 29} Young testified that she performed a physical examination of E.M., collected a DNA sample from E.M.'s mouth, and performed a sexual assault evidence collection kit. In the kit, she collected vaginal swabs, anal/perianal swabs, pubic hair combing, fingernail swabbing, and collected E.M.'s underwear. Young did not find any injuries during her exam, but did note that E.M. complained of some pain on her labia. When asked about E.M.'s demeanor during the exam, Young noted that she was very talkative and chatty but became very quiet, spoke rapidly, and had few words to say when asked about the sexual assault.

{¶ 30} On cross-examination, Young testified that E.M. referred to her physical body parts as "down there" and when she described what happened to her, she told Young that Cowgill "made me bend over the couch and he put his thing in me and I didn't like it."

10.

## F. BCI testimony

{¶ 31} The evidence collected by the SANE was sent to the Ohio Bureau of Investigation ("BCI"), where Sabrina Selbe, a forensic scientist with BCI, examined and tested it. She testified next about her DNA report based on the evidence received by the lab. Selbe explained that with their teamwork approach, while she was not the one who initially examined the evidence when it came in, she was the one who tested it. Selbe testified that there was no contamination in this case.

{¶ 32} Selbe found two DNA contributions from a non-sperm fraction sample outside the tested condom. She explained that the mixture of the contributors was consistent with E.M. and Cowgill to a certainty of 1 in 1 trillion based on the two known standards taken from the two of them. Selbe further testified that a sperm fraction with a single source of DNA was found consistent with Cowgill, and that the inside of the condom also contained a DNA profile—single source DNA consistent with Cowgill.

{¶ 33} Selbe could not say how the DNA would have come to be on a piece of evidence, but she stated that she would not expect "touch" DNA to be present on the condom, because biological fluids will often drown out touch DNA. She explained that touching an object does not leave much DNA compared to a strong fluid sample. When asked if she would expect to find E.M.'s profile on the condom had she simply touched the outside of it, Selbe answered "I would not typically expect to see that, no."

{¶ 34} On cross, Selbe conceded that her co-worker made a comment that dirt and debris were present on the condom. While she could not say for sure if the dirt and debris

11.

affected the testing, Selbe stated that "there were still really hardy DNA profiles obtained."

## G. Detective Gladieux's testimony

{¶ 35} The State's final witness, Detective Aaron Gladieux, testified that he interviewed Cowgill during the course of the investigation.

{¶ 36} His first interview with Cowgill took place on July 30, 2024. Detective Gladieux described Cowgill during the interview as very concerned for his daughter, nervous, fidgety, and sweating. He noted that Cowgill denied the allegations and when asked about the condoms, he said that there was no reason her DNA should be on the condoms—"no 100% no chance" and "no way in hell her DNA should be on [the condoms]." In video evidence of the interview presented to the jury, Detective Gladieux can be heard saying that E.M. mentioned Cowgill's fingers going inside her. Detective Gladieux did not reference this statement in his testimony.

{¶ 37} After the DNA results were issued by BCI, Detective Gladieux met with Cowgill a second time on September 17, 2024. When first asked about the DNA, Cowgill again denied any chance of E.M.'s DNA being on the condoms. Detective Gladieux noted, however, that once he told Cowgill that her DNA was on the condom, Cowgill changed his story a bit and made a comment about E.M. planting the DNA.

{¶ 38} Detective Gladieux testified that he had no contact with Cowgill after the September 17, 2024 interview.

12.

{¶ 39} On cross-examination, Detective Gladieux noted that both interviews with Cowgill were voluntary, that Cowgill continuously denied the accusations, and that he took a stress test that came back as inconclusive.

{¶ 40} The State rested.

### H. G.C. testimony

{¶ 41} Cowgill's sole witness, besides himself, was his son, G.C., E.M.'s half-brother. G.C. lived with him during the periods of time relevant to this case.

{¶ 42} G.C. testified that E.M. lies a lot, does stuff that she is not supposed to, and gets in trouble a lot. G.C. also noted that E.M. threatened suicide more than once when she was upset. Regarding her lies, G.C. explained: "Like if she hurt someone, she tried to blame it on me or just say I didn't actually do it. It doesn't really matter in what - if she would get in trouble, she would lie and try to blame it on someone else or something like that." When asked if he had ever seen his father put his hands on anyone in a way that he should not, C.G. answered, "no."

{¶ 43} When asked about Cowgill's bedroom on cross-examination, G.C. noted that Cowgill's door was usually locked—particularly when he was not there so E.M. could not get in. G.C. then noted that E.M. would go into Cowgill's room to ask him a question or try to take her tablet.

### I. Cowgill's testimony

{¶ 44} During his testimony, Cowgill first went through E.M.'s behavioral issues, his journey getting custody of her, the history of her treatments, and the changes he made

13.

to his home to protect her after her suicide attempt. Cowgill also described incidents of inappropriate communication between E.M. and men on her tablet and how one of her tablets was taken by police for an investigation. When asked about E.M.'s tendency to lie, Cowgill noted that she feared going back to jail or to the hospital and would lie to avoid it.

{¶ 45} Regarding the allegations, Cowgill confirmed E.W.'s statement that on the day E.M. made her accusations, E.M. was with her mother. He stated that E.W. called him saying that E.M. had refused to take her medications and was "acting up." Cowgill noted that they both agreed to take her to the hospital.

{¶ 46} Shortly after E.M. made her accusation, Cowgill showed up to the hospital. He testified that he spoke to E.W.'s partner outside the emergency room and was told to go home. He explained that he went home and waited on his front porch for the police to show up.

{¶ 47} Cowgill testified that once the police showed up, he admitted to knowing why they were at his house and described cooperating with them and asking them to give him a lie detector test. When asked why he was so compliant, Cowgill stated, "[b]ecause am not guilty. Anybody that knows me, knows that I would never raise my hand to a woman let alone—that's the worst crime that you could ever do to somebody."

{¶ 48} Turning to the evidence found in his home, Cowgill explained that because he had not been dating to focus on his daughter, he used a homemade sex toy for

14.

masturbating and used condoms to keep it clean.  Cowgill further explained that he used the dresser in his bedroom as a garbage can or "catch all."

{¶ 49} When asked if E.M.'s tablets were kept in that same dresser, Cowgill explained that when he took E.M.'s tablets away as a punishment for doing things she was not supposed to do, he stored the tablets in the drawer with the sex toy and condoms "thinking even if she did find it that she would find it and she would be like 'Oh God, No—I'm not touching that' and not try to take it back."

{¶ 50} Regarding his locked door, Cowgill testified that he did not keep it locked at all times like he was supposed to, but that he would try to.

{¶ 51} When asked if he raped his daughter, Cowgill stated, "Never. I would never do anything like that to anyone, let alone my own child."

{¶ 52} On cross-examination, Cowgill agreed with the State that the first suicide attempt was six to seven months prior to the July 4, 2024 incident.

{¶ 53} Throughout his testimony, Cowgill maintained his position that E.M.'s DNA should not have been on the collected condoms.  When asked by the State if his belief was that E.M. removed the condoms from the lower drawer with the sex toy and placed them underneath the top drawer, he confirmed that it was.  He explained that "she knew the sex toy was there because that's where I had hidden the tablet in the past and the only motivation I can think of for her moving the condoms from that lower drawer to the upper drawer was to get me out of the way."  When asked when he think she moved the condoms, Cowgill explained that:

Somewhere after the time that she was made the deal with the juvenile prosecutor's on it because in over nine months throughout all of this, repeatedly she has gone before every professional psychiatrist, therapist, doctor and everyone has asked her—have you ever been sexually assaulted—no. Has your father every sexually assaulted you—no my father would never in one way shape or form and all of sudden it's hey—all these charges will drop if it had happened to where all of a sudden I am being accused of sexually assaulting her. All of those charges did in fact get dropped against her to where nothing but time credited that she had on it. They promised to get her into a facility….

## J. Verdict and Sentencing

{¶ 54} After hearing the evidence, the jury acquitted Cowgill of counts one through three and convicted him of count four for the events taking place between July 3 and July 4, 2024.

{¶ 55} On April 17, 2025, the court proceeded to sentencing. The court sentenced Cowgill to 10 to 15 years' incarceration, five-year post-release control, and lifetime registration as a Tier III Sex Offender.

{¶ 56} Cowgill appealed and assigned the following errors for our review:

A. Assignment of Error One: The verdict for rape was unsupported by sufficient evidence and was therefore a violation of Due Process as guaranteed by the 5th and 14th Amendments to the U.S. Constitution and Article I, Section 16 of the Ohio Constitution.

B. Assignment Error Two: The conviction is against the manifest weight of the evidence.

## II. Law and Analysis

{¶ 57} In his assignments of error, Cowgill challenges both the sufficiency and manifest weight of the evidence. We will address the arguments in order.

16.

## A. Sufficiency

{¶ 58} In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113 (1997); *State v. Coker*, 2025-Ohio-2051, ¶ 17. In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Were*, 2008–Ohio–2762, ¶ 132. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 59} A rape conviction under R.C. 2907.02(A)(2) requires the State to prove that the defendant engaged in sexual conduct with another by compelling the other person to submit by force or threat of force. Here, Cowgill argues that his rape conviction is unsupported by sufficient evidence because there is no evidence of sexual conduct, force, or threat of force.

### 1. Sexual Conduct

{¶ 60} "'[S]exual conduct' means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C.

17.

2907.01(A). Cowgill claims this element is lacking because the state did not present sufficient evidence of penetration.

{¶ 61} Cowgill argues that this case is similar to *State v. Ferguson*, 5 Ohio St. 3d 160, 167-168 (1983), where the defendant's conviction was vacated for insufficient evidence of "sexual conduct" where the victim only testified that she and the defendant "had intercourse." In *Ferguson*, the Supreme Court of Ohio held that "intercourse" without any testimony as to any degree of vaginal or anal penetration was insufficient evidence. *Id*. at 168. Cowgill argues that E.M.'s testimony that he "had intercourse" with her and that he "made [her] do intercourse," followed by her explanations that intercourse means he was naked and that having intercourse means sexual abuse, is insufficient to support a conviction. He argues that at no time did E.M. state that he put any part of his body inside her nor did she testify that when she said "intercourse," she included penetration.

{¶ 62} In response, the State contends that there was sufficient evidence to sustain a verdict when viewed in a light most favorable to the prosecution. First, there was testimony that Cowgill had been "raping" E.M. and that he always wore a condom so that she did not get pregnant. Additionally, there was the mix of DNA on the condom found in Cowgill's dresser. Finally, when describing the "intercourse," E.M. said it was painful to her "down below area."

18.

{¶ 63} Victim testimony as to penetration is sufficient to establish the element. *See State v. Wright*, 2013-Ohio-5910, ¶ 27 (6th Dist.). *See also State v. Rowland*, 2020-Ohio-2984, ¶ 20 (12th Dist.) (victim testified that defendant touched her clitoris and that the clitoris is within the vaginal opening); *State v. Parks*, 2019-Ohio-867, ¶ 13-14 (8th Dist.) (victim testimony is sufficient and corroborating medical evidence not required). Moreover, the Supreme Court of Ohio recently pronounced that "[i]n a rape case, inferences can be drawn against the accused and in favor of the State when the record supports it." *Coker*, 2025-Ohio-2051, at ¶ 17.

{¶ 64} Regarding penetration, the State presented (1) the DNA evidence with both Cowgill and E.M.'s DNA found outside a condom; (2) E.M.'s testimony that Cowgill had intercourse with her and that it was painful to her "down below area;" (3) E.M.'s fear of getting pregnant because of "what Dad was doing to me" and tracking what he did in her tablet; (4) E.M.'s reference to Cowgill using protection because she knew he did not want her to get pregnant; (5) E.W.'s testimony that E.M. told her Cowgill was "raping" her; (6) the testimony of the SANE nurse that E.M. told her that that Cowgill "made me bend over the couch and he put his thing in me and I didn't like it;" (7) the testimony of the BCI technician who did not believe E.M.'s profile would have shown up on the condom had it only been her "touch" DNA; and (8) the video of Detective Gladieux telling Cowgill that E.M. reported his fingers going inside her.

{¶ 65} This record supports an inference of penetration, which is sufficient evidence of sexual conduct. While Cowgill argues that E.M.'s testimony regarding the use of the word "intercourse" is insufficient to prove penetration under *Ferguson*, his reliance upon that case is misplaced. The Supreme Court of Ohio recently limited *Ferguson* to its facts. *Coker* at ¶ 18. And even setting that limitation aside, this case is easily distinguishable from *Ferguson*. There, the Supreme Court made clear that the victim's testimony was "the *only* evidence which arguably tends to establish vaginal or anal intercourse." *Ferguson*, 5 Ohio St.3d at 167. Here, there was DNA evidence, testimony from E.M., and other witness testimony which more explicitly references penetration—all of which, when viewed in the light most favorable to the prosecution, supports an inference of sexual misconduct. *Coker* at ¶ 17.

### 2. Force or Threat of Force

{¶ 66} "Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1).

{¶ 67} Cowgill argues that the State failed to present sufficient evidence that he compelled E.M. to submit to sexual conduct by force or threat of force. He claims that there must be some evidence of fear, duress, or intimidation. Cowgill argues that E.M.'s testimony was insufficient to show that her will was overcome by fear or duress. He contends that the only physical force E.M. testified to was that "he pushed me over the edge of the couch" and that he took off her clothing.

20.

{¶ 68} In response, the State looks to E.M's testimony that Cowgill pushed her over the arm of the couch and removed her clothes, and that he told her to never tell anyone about what was happening and that no one would believe her. Additionally, the State notes that E.M. testified that she did not feel safe and feared that he would hurt her. The State maintains that the evidence presented at trial showed that E.M.'s will was overcome by fear, duress or intimidation in part, because of the parent-child relationship between her and Cowgill, with whom she lived at the time.

{¶ 69} "A defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit." *State v. Schaim*, 65 Ohio St.3d 51 (1992), paragraph one of the syllabus. The force required to commit rape is that which is necessary to overcome the will of the victim. *State v. Muller*, 2012–Ohio–3530, ¶ 57 (3d Dist.). It is a relative term that depends on the age, size, and strength of the parties and their relation to each other. *State v. Eskridge*, 38 Ohio St.3d 56 (1988), paragraph one of the syllabus, citing *State v. Labus*, 102 Ohio St. 26, 38–39 (1921).

{¶ 70} Moreover, a victim's non-consent to sexual conduct is not required to prove forcible rape; rather, evidence of consent—or lack thereof—goes to the State's ability to prove whether the defendant purposefully forced or compelled the victim. *State v. Hartman*, 2016–Ohio–2883, ¶ 27 (2d Dist.).

21.

{¶ 71} In cases specifically involving sexual contact or conduct between a minor child and a parent, the Supreme Court of Ohio has held that force "need not be overt and physically brutal, but can be subtle and psychological" and that the element can be established "[a]s long as it can be shown that the rape victim's will was overcome by fear or duress[.]" *Eskridge* at 58, 59. The court recognized "coercion inherent in parental authority when a father sexually abuses his child," and noted that "'[s]exual activity between a parent and a minor child is not comparable to sexual activity between two adults with a history of consensual intercourse. The youth and vulnerability of children, coupled with the power inherent in a parent's position of authority, creates a unique situation of dominance and control in which explicit threats and displays of force are not necessary to effect the abuser's purpose.'" *Id*. at 59, quoting *State v. Etheridge*, 319 N.C. 34, 47, 352 S.E.2d 673, 681 (1987). Therefore, "[w]ith the filial obligation of obedience to a parent, the same degree of force and violence may not be required upon a person of tender years, as would be required were the parties more nearly equal in age, size and strength." *Id.* at paragraph one of the syllabus.

{¶ 72} Here, the State presented E.M.'s testimony that (1) Cowgill pushed her over the arm of the couch; (2) Cowgill took off E.M.'s clothes; (3) Cowgill told her never to tell anyone and that no one would believe her; and (4) she did not feel safe and was trying to get out of Cowgill's house because she was afraid that he would hurt her.

{¶ 73} This is clearly sufficient evidence of force. Under *Eskridge*, the state merely had to establish that Cowgill exerted "subtle and psychological" force over E.M.,

22.

his daughter, that was sufficient to overcome her will by fear or duress. *Id.* at 59. Here, the record shows that Cowgill exerted psychological duress over E.M. to prevent her from disclosing the abuse, and that E.M. was afraid of her father. And even if *Eskridge* did not apply, courts have found sufficient force to support a conviction under R.C. 2907.02(A)(2) where, like here, defendants engaged in combinations of minimal physical force (e.g., pushing and pulling), removing the victim's clothing, and laying on top of the victim after the victim expressed disinterest in or discomfort with the sexual contact. *E.g., Hartman* (defendant pushed adult victim onto a bed, removed her clothes, laid on top of her, and pulled her into a shower); *Muller* (defendant removed intoxicated adult victim's clothes and did not stop intercourse when victim "batted at him"); *State v. El–Berri*, 2008–Ohio–3539 (8th Dist. ) (defendant bent 16–year-old victim over a couch, removed her clothes, and engaged in vaginal intercourse with her); *State v. Rupp*, 2007–Ohio–1561 (7th Dist.) (defendant removed adult victim's clothing, laid on top of her, and engaged in vaginal intercourse with her while she attempted to push him away and told him "no"); *State v. Shannon*, 2004–Ohio–1669 (11th Dist.) (defendant pushed down 15–year-old victim's partially-removed pants, laid on top of her, and proceeded with intercourse after she replied "uh-uh" to him asking "Is this okay?"). Thus, the record in this case provides sufficient evidence that Cowgill compelled E.M. to submit to sexual conduct by "force."

{¶ 74} In sum, the testimony provided by the State's witnesses provides sufficient evidence that Cowgill penetrated E.M. and compelled her to submit to intercourse by force.

23.

{¶ 75} Accordingly, we find Cowgill's first assignment of error not well-taken.

## B. Manifest Weight

{¶ 76} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "[W]e do not view the evidence in a light most favorable to the State. Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 2012–Ohio–6068, ¶ 15 (6th Dist.), quoting *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *Martin* at 175.

{¶ 77} Although under a manifest weight standard we consider the credibility of witnesses, we extend special deference to the jury's credibility determinations given that it is the jury that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012–Ohio–616, *3 (6th Dist.).

{¶ 78} In his argument that his rape conviction is against the manifest weight of the evidence, Cowgill focuses on E.M.'s forgetfulness and lack of details in her testimony, as well as her behavioral issues. He notes that E.M. changed her story and

24.

recanted her allegation against him. Additionally, Cowgill emphasizes that E.M. knew where he kept the condoms in his bedroom drawer and argues that this supports his belief that she would have had ample time and opportunity to access the dresser and put her DNA on the condom and maintains his belief that she put her DNA there because she was suicidal and he was keeping her from killing herself.

{¶ 79} Additionally, Cowgill goes on to point out that Selbe, the BCI agent, could not say how the DNA came to be on the condom and that DNA could have transferred from item to item. He also emphasizes that there was dirt and debris found on the condom.

{¶ 80} In response, the State contends that E.M. could recall the details of the July 3 offense, and compare her memory of this event to the offenses for which Cowgill was acquitted. Notably, the State highlights that E.M. testified that Cowgill always used a condom and told police where they could be found. Furthermore, the State notes that Cowgill's bedroom door was usually locked and E.M. testified that she never touched the condoms. In addition to the testimony, the State highlights the DNA analysis which found both Cowgill and E.M.'s DNA on the outside of the tested condom.

{¶ 81} While we consider the credibility of witnesses in our manifest weight review, "we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and

discerning qualities such as hesitancy, equivocation, and candor." (Citations omitted.) *State v. Glaze*, 2019-Ohio-53, ¶ 21 (6th Dist.).

**{¶ 82}** Here, while Cowgill is correct that the BCI technician could not state exactly how E.M.'s DNA came to be on the condom, she also testified that based on her knowledge, she would not expect E.M.'s DNA to be on the condom if it were solely touch DNA. And while Selbe admitted that there was some dirt and debris on the condom, she emphasized that she was still able to get a strong DNA reading.

**{¶ 83}** Additionally, Cowgill cross-examined E.M. and the other State witnesses, and had the opportunity to challenge the evidence presented by the State. Ultimately, the jury chose to believe E.M. over Cowgill. We cannot say that it lost its way or created a manifest miscarriage of justice in doing so. We find, therefore, that Cowgill's conviction of rape is not against the manifest weight of the evidence.

**{¶ 84}** Accordingly, we find Cowgill's second assignment of error not well-taken.

### III. Conclusion

**{¶ 85}** Sufficient evidence of sexual conduct was presented by the State to support Cowgill's conviction of rape. Additionally, Cowgill's conviction was not against the manifest weight of the evidence—the jury made credibility determinations in favor of the State, and we do not find that it lost its way in doing so.

**{¶ 86}** Accordingly, we find Cowgill's assignments of error not well-taken, and we affirm the April 17, 2025 judgment of the Fulton County Court of Common Pleas.

26.

Cowgill is ordered to pay the costs of this appeal under App.R. 24.

                                                          Judgment affirmed.


        A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.



Thomas J. Osowik, P.J.          _____
                                                 JUDGE

Christine E. Mayle, J.          

Gene A. Zmuda, J.               _____
CONCUR.                                          JUDGE

                                _____
                                                 JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.